IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HBW HOLDINGS INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. _____ |
| | : | |
| ROBERT Y. BONHAM, | : | |
| GARY D. MABRY, | : | |
| CHARLES E. NAIL, JR. and | : | |
| MABRY FAMILY LIMITED | : | |
| PARTNERSHIP, a Florida limited lia- | : | |
| bility partnership. | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff HBW Holdings Inc. ("HBW" or "Plaintiff"), by and through

its undersigned attorneys, hereby alleges upon knowledge as to itself and upon

information and belief as to all others, as follows:

### INTRODUCTION

1.    This is an action to recover damages resulting from the breach

of representations and warranties in a stock purchase agreement.

2.    The suit arises out of the sale of Arias Acquisitions, Inc.

("Arias" or the "Company"), a holding company that owns various entities engaged

in the home warranty business.

3.    Pursuant to an agreement dated May 31, 2002 (the "Stock Purchase Agreement"), defendants Robert Y. Bonham, Gary D. Mabry, Charles E. Nail, Jr. and the Mabry Family Limited Partnership (collectively, the "Defendants") agreed to sell to HBW all of the outstanding capital stock of Arias (and also to enter into non-competition agreements) for approximately $202 million (the "Transaction").

4.    In connection with the sale, Defendants provided HBW with copies of the Company's financial statements for the fiscal years ended December 31, 1998, 1999, 2000 and 2001, and interim unaudited financial statements for the four-month period ended April 30, 2002 (collectively, the "Financial Statements").

5.    In the Stock Purchase Agreement, Defendants expressly represented that the Financial Statements had been prepared in all material respects with generally accepted accounting principles ("GAAP").

6.    Defendants controlled all aspects of HBW's operations and were directly responsible for the application of GAAP to the Company's financial results.

7.    During its audit of HBW's financials for the year ended December 31, 2003, PricewaterhouseCoopers ("PWC"), HBW's accounting firm, notified HBW management ("Management") that it could not certify HBW's 2003 financials because the revenue recognition methodology used by HBW historically did not comply with GAAP.

2

8.    The GAAP-mandated changes required not only the application of a different revenue recognition methodology going forward, but also the restatement of HBW's prior-period financial statements.

9.    The required restatements resulted in numerous changes to the Financial Statements, including, among other things:

(a)    For the year ended December 31, 2001:

- an estimated $31 million reduction in revenue; and

- an estimated $16.6 million reduction in net income;

(b)    For the year ended December 31, 2002:

- an estimated $40 million reduction in revenue; and

- an estimated $20 million reduction in net income.

10.    HBW had to immediately inform its lender of these developments and negotiate and obtain substantial changes to its credit agreement in order to avoid an event of default.  HBW incurred significant legal costs related to the credit agreement renegotiation alone.

11.    In order to limit the impact of the misstatements, Management reorganized HBW into two independent business units, HBW Services, LLC ("Services") and Residential Loss Control, LLC ("Insurance").  HBW incurred significant expenses during the reorganization effort, including the cost of obtaining new audits for prior years.

3

12. Management also attempted to market Services to strategic and financial buyers. Although HBW succeeded in attracting expressions of interest from 69 potential acquirers and entertained 23 first-round bids, concern among potential bidders about the ability of Services to function apart from Insurance and the delay in obtaining audited financial statements hindered the sale process and contributed to its failure.

13. Because the Company's Financial Statements were not prepared in accordance with GAAP and contained material misstatements, Defendants breached the express terms of the Stock Purchase Agreement.

14. As a result of Defendants' actions, HBW bought Arias at an inflated price. In an attempt to mitigate its damages, HBW engaged in a costly and complex reorganization, and then a disruptive and fruitless sales process.

15. Accordingly, HBW seeks recovery for the tens of millions of dollars in damages it has incurred because of Defendants' breach of the Stock Purchase Agreement's representations and warranties.[1]

---

[1]     In a transparent attempt to preempt this lawsuit, Defendants filed a Complaint in the Delaware Court of Chancery on November 10, 2003, seeking declaratory judgment and other relief. HBW and Arias's motion to dismiss the Amended Complaint in that action is pending.

## THE PARTIES

16.    Plaintiff HBW is a Delaware corporation that acquired all the stock of Arias in 2002 pursuant to the Stock Purchase Agreement.

17.    Defendant Gary D. Mabry, a resident of Florida, was the President and a director of Arias from 1998 until 2002. In that capacity, he was directly responsible for the financial statements of the Company, and had direct knowledge of the true financial well-being of the Company. Mabry sold his capital stock in Arias to HBW in 2002 pursuant to the Stock Purchase Agreement.

18.    Defendant Charles E. Nail, a resident of Florida, was a Vice President, Treasurer and a director of Arias from 1998 until 2002. In that capacity, he was directly responsible for the financial statements of the Company, and had direct knowledge of the true financial well-being of the Company. Nail sold his capital stock in Arias to HBW in 2002 pursuant to the Stock Purchase Agreement.

19.    Defendant Robert J. Bonham, a resident of Florida, was the Secretary and a director of Arias from 1998 until 2002. In that capacity, he was directly responsible for the financial statements of the Company, and had direct knowledge of the true financial well-being of the Company. Bonham sold his capital stock in Arias to HBW in 2002 pursuant to the Stock Purchase Agreement.

20.    Defendant Mabry Family Limited Partnership, is a Florida limited liability partnership with its principal place of business at 101 North River-

5

side Drive, Suite 117, Pompano Beach, Florida 33062. The Partnership sold its

Arias capital stock to HBW in 2002 pursuant to the Stock Purchase Agreement.

## JURISDICTION

21.    This is a civil action between citizens of different states in

which the plaintiff seeks tens of millions of dollars in damages. As a result, this

Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## VENUE

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and

the forum selection clause in § 9.9 of the Stock Purchase Agreement.

## FACTUAL BACKGROUND

### A.    The Transaction And Related Agreements

23.    Defendants have worked in the home warranty industry since

the mid-1970s. In 1998, they formed Arias as a holding Company for their diverse

home warranty business and, in their respective positions, ran the Company and were

responsible for, among other things, preparing and maintaining the Company's

periodic financial statements.

24.    In late 2001, Defendants began exploring the sale of Arias with

the assistance of Wachovia Securities.

25.    On May 31, 2002, HBW agreed to pay approximately $202

million – $179 million in cash, $20 million in promissory notes and $3 million in

6

shares of HBW common stock[2] – in exchange for Defendants' capital stock in Arias

and a binding commitment not to compete in the same industry.

      26.   In connection with the sale of the Company, Defendants made

several express representations and warranties to encourage HBW to complete the

Transaction.  HBW relied on these representations and warranties when entering into

the Transaction.

      27.   For example, in Section 3.5(b) of the Stock Purchase Agree-

ment, Defendants represented that except as set forth on Schedule 3.5, the Com-

pany's financial statements:

    (i)      have been (or, in the Case of the Monthly Financial State-
ments, will be) derived from the books and records of the Companies;

    (ii)     have been (or, in the Case of the Monthly Financial State-
ments, will be) prepared in all material respects in compliance with
accounting practices generally accepted in the United States
("GAAP"), consistent with past practices except that the Interim
Financial Statements do not contain footnotes; and

    (iii)    present (or, in the case of the Monthly Financial Statements,
will when delivered present) fairly in all material respects the finan-
cial position, results of operations, retained earnings and cash flows,
as applicable, of Arias and the Operating Companies as of their
respective dates and for the respective periods covered thereby,
subject in the case of the Interim Financial Statements to normal year-
end adjustments consistent with past practice.

---

[2]    The 10,400 shares of stock Defendants received in the Transaction repre-
sented approximately 4% of the HBW shares then outstanding.  In late July
2005, in connection with a corporate restructuring at HBW, the promissory
notes held by Defendants were paid in full (including accrued interest).

(iv)    the Books and Records are complete and accurate in all
material respects and have been made available as requested in writing by Buyer.

(Emphasis added.)

28.    Section 3.12(a) of the Stock Purchase Agreement states that:

"[s]ince January 1, 1999, the Companies have been and are in material compliance

with Applicable Law."

29.    Section 3.25 of the Stock Purchase Agreement reads:

**Full Disclosure**.  To the knowledge of Sellers, Sellers have not failed to
disclose to Buyer any facts related to the Business, results of operations,
assets, liabilities, reserves or financial condition of Arias and the other
Companies that could reasonably be expected to cause a Material Adverse
Effect.

30.    In Section 5.8(c), Defendants agreed that a pre-closing balance

sheet that Arias was to deliver to HBW would be "prepared in accordance with

GAAP applied in a manner consistent with Arias's past practices."

31.    The Stock Purchase Agreement also contains a number of

provisions detailing how the parties to the Transaction would resolve any disputes

arising from their agreement.

32.    For example, Section 7.2(b) of the Stock Purchase Agreement

provides that Defendants "shall indemnify, defend and hold [HBW] and its affiliates

and their respective, officers, directors and employees ... harmless ... as to any Loss

incurred by them or the Companies resulting from any of the following: . . . Any

8

breach of any representation, warranty, covenant or agreement made by Sellers in this Agreement."

33.    In general, the parties' ability to seek indemnification under the Agreement terminates two years after the closing date – that is, on November 8, 2004.  See SPA § 7.5(b).   However, once a party makes a claim for indemnification under the Stock Purchase Agreement, the obligation to indemnify continues until any liability is determined and paid in accordance with the terms of the Agreement.  See SPA 7.5(b)(iv).  Moreover, a party's indemnification obligation continues indefinitely as to covenants set forth in the Stock Purchase Agreement.  See SPA 7.5(b)(i).

34.    In Section 2.5 of the Stock Purchase Agreement, the parties agreed that HBW would pay Defendants $177 million on the date of closing and would deposit the remainder of the purchase price – $25 million – into an escrow account.  The escrowed funds were to cover any indemnification claims HBW might have for losses caused by, among other things, a breach of Defendants' representations and warranties.

35.    An escrow agreement (the "Escrow Agreement" or "EA"), executed by the parties and Mercantile-Safe Deposit and Trust Company (the "Escrow Agent") on November 8, 2002, governs both the management of the funds in escrow and the release of those funds in appropriate circumstances.

36. Significantly, once notice is given pursuant to Section 3(b), the Escrow Agreement expressly provides that the escrow funds (in an amount equal to the disputed claim(s) at issue) will remain in escrow, even beyond the otherwise applicable two-year expiration date of the escrow, until the dispute is resolved.  EA § 4 ("On November 9, 2004, Escrow Agent shall pay and distribute the then amount of Escrow Fund to Sellers according to each Seller's Proportionate Share, unless any Claims are then pending, in which case an amount equal to the aggregate dollar amount of such Claims (as shown in the Notices of such Claims) shall be retained by Escrow Agent in the Escrow Fund....").

**B.**   **HBW Discovers That Defendants Breached The Representations And Warranties Of The Stock Purchase Agreement**

37. The parties executed the Stock Purchase Agreement on May 31, 2002.

38. HBW and its advisors, including PWC, engaged in several months of due diligence.  The due diligence process was heavily dependent on the materials provided by Arias, as well as Defendants' representations about the Company's financial well-being.

39. The Transaction closed on November 8, 2002.

40. In early 2004, PWC began its audit of HBW for the year ended December 31, 2003.  During the course of the audit, PWC determined that the

10

revenue recognition methodology that HBW had used historically did not comply with GAAP.

    41.   PWC informed Management about the problem and began to examine HBW's historical financials to determine the extent of the accounting discrepancies.

    42.   On July 30, 2004, HBW representatives wrote counsel for Defendants to confirm earlier communications between the parties about HBW's concerns with the Financial Statements (the "July 30 Letter"). The July 30 Letter stated, in pertinent part, that: "it appears Arias Acquisitions' financial statements were not prepared in accordance with GAAP. We are pursuing numerous restructuring options in order to minimize damages that may result from this circumstance. When we have more information, we will contact you."

    43.   On October 12, 2004, HBW sent an indemnification Claim Notice, pursuant to the Stock Purchase Agreement, that provided details of a potential claim for breach of Defendants' representation that Arias's financial statements complied with GAAP (the "October SPA Notice").

    44.   Specifically, in the October SPA Notice, HBW explained that "the Company's audited financial statements for the fiscal years ended December 31, 2001, 2000, and 1999 were not prepared in all material respects in compliance with accounting practices generally accepted in the United States, contrary to the repre-

sentation made to HBW in Section 3.5(b) of the Agreement." <u>See</u> October SPA

Notice, at 2.

        45.   In particular, HBW explained:

> Based on our current information, if such financial statements had been
> prepared in compliance with accounting practices generally accepted in the
> United States, the Company would have shown significantly reduced net
> income, and potentially even net losses for each of the fiscal years ended
> December 31, 2001, 2000 and 1999.  We believe, as a result of extensive,
> ongoing investigations and consultation with our accountants, that the
> financial statements were erroneously prepared due to the application of an
> inappropriate revenue recognition methodology.  We continue to explore
> ways to mitigate our damages, including restructuring the Company's hold-
> ings.
>
> To date, we have not quantified the extent of the Losses.  However, you are
> hereby notified pursuant to 7.6(a) of the Agreement that we are seeking
> indemnification for any such amounts pursuant to Section 7.2 of the Agree-
> ment.

<u>Id.</u> at 2-3.

        46.   While the accounting investigation continued, representatives of

HBW asked Defendants to enter into a tolling agreement.  In early November 2004,

Defendants refused to do so.

        47.   On November 4, 2004, HBW again provided notice of a

misstatement claim pursuant to the terms of the Stock Purchase Agreement, as well

as the Escrow Agreement (the November SPA Notice, and November EA Notice,

respectively).  In both notices, HBW explained that it "estimate[d] the amount of its

Loss [from the misstatement claim] to be in excess of $25 million." See November

SPA Notice, at 3; November EA Notice, at 2.

      48.   The November SPA Notice provided substantial detail about the

misstatement claim:

> As part of Buyer's acquisition of all of the outstanding shares of capital stock of Arias, Sellers made representations to Buyer regarding, among other things, the accuracy of the Financial Statements and Books and Records, reserves, compliance with Applicable Law, and Sellers' disclosure of facts that could reasonably be expected to cause a Material Adverse Effect. Buyer relied on these representations and warranties and on the information provided to Buyer pursuant to these representations and warranties, and the aggregate purchase price of approximately $202,000,000 was based on that information.

> The Financial Statements (including without limitation the audited consolidated financial statements for year-end 2001, the consolidated financial statement prepared as of April 30, 2002, and the Monthly Financial Statements delivered in accordance with the Agreement) were not prepared in accordance with GAAP primarily as a result of the failure to properly recognize revenue as required by the Securities and Exchange Commission's Staff Accounting Bulletin No. 101, Revenue Recognition in Financial Statements ("SAB 101"). This failure to properly report revenue caused numerous line items of the Financial Statements to be misstated, and caused the Financial Statements to fail to present fairly in all material respects the financial position, results of operations, retained earnings and cash flows, as applicable, of Arias and the Operating Companies.

> Specifically, with respect to the revenues, New Home warranty administration fees, other than fees related to builder program membership, were required to be separated between the one and two year warranty commitment and the ten year warranty commitment. These two fees were then required to be recognized into income on a basis equal to the amount received multiplied by the ratio of the incurred loss and loss adjustment expenses to total ultimate loss and loss adjustment expenses of the Insurance Subsidiaries.

> While our investigation is ongoing, we believe for example that
> proper application of SAB 101 would result in deferral of approximately
> $14.7 million of revenue, net of deferred acquisition costs and deferred tax
> expense, for the year ended December 31, 2001. Accordingly, net income
> should have been reported as a loss of at least approximately $2.4 million for
> the year ended December 31, 2001. Other periods represented in the Agree-
> ment are similarly misstated.
>
> . . .
>
> As a result of the foregoing matters, Sellers have breached the
> Agreement and Sections 3.5, 3.6, 3.12, 3.19, 3.20, 3.25, 5.5 and 5.8
> thereof, and are obligated to indemnify Buyer in accordance with the
> provisions of Articles 6 and 7, as applicable.

See November SPA Notice, at 1-3.

49.    Defendants disputed these claims in a Counter Notice dated

November 5, 2004, effectively freezing the $25 million in escrow (pursuant to § 3(b)

of the Escrow Agreement) until the parties reached agreement on the issue, or a court

of competent jurisdiction issued a final non-appealable order. See EA § 3(b).

**C.    The Reorganization And Sale Process**

50.    In order to limit the impact of the misstatements, Management

reorganized the company into two independent business units, Services and Insur-

ance. By splitting the warranty services and insurance components of the business

into stand-alone entities that could be audited independently, management hoped to

mitigate HBW's revenue accounting problems.

51.    The reorganization process required hundreds of hours of work

from Management and its advisors.

52.    After the reorganization, Management attempted to sell the Services component of the now divided business. HBW retained Banc of America Securities ("Banc of America") and Goldman Sachs ("Goldman") as financial advisors in order to pursue a potential sale to a strategic or financial buyer.

53.    In Fall 2004, Banc of America and Goldman contacted a total of 125 parties regarding the potential sale. Sixty-nine parties expressed interest, executed a confidentiality agreement, and received a packet of confidential information. Concern over the ability of Services to operate independently from Insurance worried some suitors from the outset of the sale process; the delay in obtaining new audited financials also concerned the potential bidders.

54.    On November 16, 2004, 23 of these suitors made a first round bid for Services.

55.    Several of these first round bidders, however, continued to express concern over the Company's accounting issues. For example, one potential buyer expressly informed HBW that the Company's accounting issues – especially as they related to revenue deferral – would operate to reduce its bid for Services.

56.    Between December 2004 and January 2005, eight out of the 23 first round bidders conducted due diligence. The accounting issues and the separation of the Insurance unit from the Services unit continued to plague the sale process.

57.    Ultimately, only two potential acquirers made second round bids. Both bids were well beneath the range of values indicated in the initial bids, in part because of concern over the accounting problems.

58.    Neither of these final two bids was adequate, in the judgment of HBW management and its financial advisors, and therefore both were rejected.

59.    Representatives of HBW spent countless hours and incurred significant costs in connection with this failed sales process.

60.    After these disappointing results, HBW abandoned the sale process and conducted a recapitalization instead.

**D.    The Extent Of The Misstatement**

61.    The Financial Statements (including without limitation the audited consolidated financial statements for year-end 2001, the consolidated financial statement prepared as of April 30, 2002, and the Monthly Financial Statements delivered in accordance with the Stock Purchase Agreement) were not prepared in accordance with GAAP, as a result of the failure to recognize revenue as required by the Securities and Exchange Commission's Staff Accounting Bulletin No. 101, Revenue Recognition in Financial Statements ("SAB 101") and other applicable accounting rules and principles.

62.    The failure to report revenue properly caused the misstatement of numerous line items in the Financial Statements. In turn, the Financial Statements

failed to present fairly in all material respects the financial position, results of operations, retained earnings and cash flows, of Arias and the Operating Companies.

63. For example, for the period from January 1, 2001 to December 31, 2001, the GAAP-mandated restatements resulted in an estimated $31 million reduction in revenue and an estimated $16 million reduction in net income.

64. For the period from January 1, 2002 to December 31, 2002, the GAAP-mandated restatements resulted in an estimated $40 million reduction in revenue and an estimated $20 million reduction in net income.

65. For both 2001 and 2002, the GAAP-mandated changes resulted in an approximate 33% reduction in revenue.

66. HBW's previously reported net income for 2001 of slightly more than $12 million was reversed to a net loss of more than $4 million as a result of the accounting changes.

67. Similarly, for 2002, net income of nearly $8 million plummeted to a net loss of slightly more than $12 million.

68. In sum, the accounting changes have revealed that HBW purchased Arias at a grossly inflated price.

69. In total, Plaintiff has incurred tens of millions of dollars in damages as a result of Defendants' breach of their obligations under the Stock Purchase Agreement.

17

## COUNT I:
## Breach of Contract

70.    Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

71.    Plaintiff brings this count against Defendants Robert J. Bonham, Gary D. Mabry, Charles E. Nail and Defendant Mabry Family Limited Partnership.

72.    The Defendants were parties to the Stock Purchase Agreement.

73.    As parties to the Stock Purchase Agreement, Defendants made representations and warranties to induce HBW to enter into the contract.  Specifically, Defendants represented and warranted, among other things, that the Company's financial statements had been prepared in all material aspects in compliance with GAAP, and that the pre-closing balance sheet Arias was to deliver to HBW would be "prepared in accordance with GAAP applied in a manner consistent with Arias's past practices."  Defendants further promised that the Company's financial statements presented "fairly in all material respects the financial position, results of operations, retained earnings and cash flows" of the Company.

74.    The Defendants breached their contractual obligations set forth in the Stock Purchase Agreement by furnishing the Plaintiff with Financial Statements that were not prepared in accordance with GAAP.  The Financial Statements failed to present fairly in all material respects the financial position, results of

18

operations, retained earnings and cash flows, as applicable, of Arias and its subsidiaries.

75.   Plaintiff has incurred more than $25 million in losses and millions of dollars in costs as a result of Defendants' breach of their contractual obligations.

## COUNT II
## Breach of Warranty

76.   Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

77.   Plaintiff brings this count against Defendants Robert J. Bonham, Gary D. Mabry, Charles E. Nail, and Defendant Mabry Family Limited Partnership.

78.   The Defendants were parties to the Stock Purchase Agreement.

79.   As parties to the Stock Purchase Agreement, Defendants made representations and warranties to induce HBW to enter into the contract.  Specifically, Defendants represented and warranted, among other things, that the Company's financial statements had been prepared in all material aspects in compliance with GAAP, and that the pre-closing balance sheet Arias was to deliver to HBW would be "prepared in accordance with GAAP applied in a manner consistent with Arias's past practices."  Defendants further promised that the Company's financial statements presented "fairly in all material respects the financial position, results of operations, retained earnings and cash flows" of the Company.

80.  The Defendants made these representations and warranties to Plaintiff as an inducement to enter into the Stock Purchase Agreement and to consummate the transactions contemplated hereby.

81.  Plaintiff relied on Defendants' express representations and warranties concerning the accuracy and veracity of their Financial Statements, and would not have agreed to pay $202 million if it had been aware of the Company's true financial condition.

82.  Because Plaintiff reasonably relied on the Defendants' written assurances that the Financial Statements were prepared in accordance with GAAP, Plaintiff has incurred more than $25 million in losses and millions of dollars in costs as a result of Defendants' breach of their contractual obligations.

## COUNT III
## Negligent Misrepresentation

83.  Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

84.  Plaintiff brings this count against Defendants Robert J. Bonham, Gary D. Mabry, Charles E. Nail, and Defendant Mabry Family Limited Partnership.

85.  As parties to the Stock Purchase Agreement, Defendants were duty-bound to provide HBW with accurate information during the due diligence process.

20

86.    The Defendants supplied HBW with false information regarding the Financial Statements of the Company, and failed to exercise reasonable care in obtaining this information and communicating it to HBW.

87.    By relying on the Financial Statements, Plaintiff has incurred more than $25 million dollars in losses and millions of dollars in costs as a result of Defendants' breach of their contractual obligations.

WHEREFORE, Plaintiff respectfully requests that the Court enter an order:

A.    Awarding compensatory damages for Defendants' breaches of contract;

B.    Awarding compensatory damages for Defendants' negligent conduct;

C.    Awarding HBW its reasonable attorneys' and professionals' fees and costs; and

D.    Awarding such other relief as the Court deems just and proper.

Thomas J. Allingham II (#476)
Edward B. Micheletti (#3794)
T. Victor Clark (#4238)
A. Thompson Bayliss (#4379)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000
Attorneys for Plaintiff

DATED:  August 24, 2005